THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| In re:   LandAmerica Financial Group, Inc., *et al*., | Case No. 08-35994-KRH |
| Debtors. | Chapter 11 |
| LandAmerica Financial Group, Inc., | |
| Plaintiff, | |
| v. | APN 10-03819-KRH |
| Southern California Edison, | |
| Defendant. | |

## **MEMORANDUM OPINION**

Before the Court are cross motions for summary judgment (the "Motions") filed by Plaintiff LandAmerica Financial Group, Inc. ("LFG" or "Plaintiff") and by Defendant Southern California Edison seeking summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, as incorporated by Rule 7056 of the Federal Rules of Bankruptcy Procedure. The Motions concern the avoidance and recovery of certain allegedly fraudulent transfers pursuant to 11 U.S.C. § 548 (a)(1)(B) and Virginia Code § 55-81.

The Court conducted a hearing on the Motions on May 1, 2014 (the "Hearing"). Finding that LFG received reasonably equivalent value in exchange for the transfers it made to Southern California Edison through the operation of LFG's centralized cash management system, the Court will deny the motion for summary judgment filed by LFG and grant summary judgment in

favor of the Defendant. This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.[1]

## Procedural Background

On November 26, 2008 (the "Petition Date"), LFG filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").[2] After the Petition Date, LFG continued to manage its properties and operate its businesses as debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108. Thereafter, several other affiliated LandAmerica entities, including LandAmerica OneStop Inc. ("OneStop") and Southland Title Corporation ("Southland"), also commenced voluntary cases under Chapter 11 of the Bankruptcy Code (the affiliated entities, together with the Initial Debtors, the "Debtors").[3] The bankruptcy cases of the affiliated LandAmerica Debtors, including the cases filed by OneStop and Southland, have been jointly administered for procedural purposes with LFG's bankruptcy case.[4]

On September 9, 2009 the Debtors filed a Joint Chapter 11 Plan of LandAmerica Financial Group, Inc. and its Affiliated Debtors (as finally revised, the "Plan").[5] The Court confirmed the Plan, which became effective as to all the Debtors, with the exception of OneStop,

---

[1] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. P. 7052.

[2] LandAmerica Exchange Services, Inc. ("LES"), one of the subsidiaries of LFG, filed a voluntary petition under the Bankruptcy Code on the same day (LES, with LFG, the "Initial Debtors").

[3] Southland filed its voluntary Chapter 11 bankruptcy petition on March 31, 2009. The bankruptcy case was assigned number 09-32063-KRH. OneStop filed its voluntary Chapter 11 bankruptcy petition on November 4, 2009. The bankruptcy case was assigned number 09-37276-KRH.

[4] *See* order entered April 9, 2009, in case number 09-32063-KRH and order entered November 11, 2009, in case number 09-37276-KRH.

[5] The Joint Chapter 11 Plan of LandAmerica Financial Group, Inc. and its Affiliated Debtors was revised on October 2, 2009; October 12, 2009; and October 24, 2009.

on December 7, 2009. The Plan became effective as to OneStop on March 1, 2010.[6] The Plan created separate liquidating trusts for LFG and for each of the other LFG affiliated Debtors. The Plaintiff in this adversary proceeding was created to oversee the liquidation and distribution of the LFG assets.[7]

On November 24, 2010, Plaintiff filed this Complaint against Defendant Southern California Edison seeking to avoid and recover certain transfers in the aggregate amount of $263,462.69 (the "Transfers")[8] made by LFG to Southern California Edison during the nine-month period immediately preceding the Petition Date. In Count I of the Complaint, Plaintiff seeks to avoid the Transfers pursuant to 11 U.S.C. § 548(a)(1)(B) as constructively fraudulent conveyances, alleging that LFG did not receive reasonably equivalent value. In Count II of the Complaint, Plaintiff seeks to avoid the Transfers under 11 U.S.C. § 544(b)(1) and Virginia Code § 55-81, alleging that the transfers were not made in exchange for valuable consideration.[9]

The Court has subject-matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F) and (O). Venue is appropriate in this Court pursuant to 28 U.S.C. § 1409.

---

[6] OneStop's belated entry into bankruptcy caused the delay in the effective date in its case.

[7] The Plan did not consolidate the various bankruptcy estates of LFG and its affiliated Debtors; but, rather, created separate liquidating trusts for each debtor.

[8] Since the filing of the Complaint, the Plaintiff has determined that $26,170.33 of the Transfers were made by LFG on behalf of subsidiaries that were solvent at the time the transfers were made. As such, the Plaintiff is no longer pursuing its fraudulent claims with respect to those transfers, leaving a total of $237,292.36, for which the LFG liquidating trustee now seeks recovery.

[9] Plaintiff advised the Court at the Hearing, that the Plaintiff was no longer pursuing Count III of the Complaint.

**Facts**

LandAmerica Financial Group, Inc. was a holding company that operated title insurance businesses and other real estate transaction service businesses through various affiliated subsidiary entities. LFG did not sell services or products of its own and did not generate revenues of its own from customers. Rather, LFG conducted all of its operations through its operating subsidiaries. OneStop and Southland were two such wholly-owned subsidiaries of LFG.[10] The valuable assets of LFG consisted almost entirely of its equity interests in, and its intercompany receivables from, LFG's subsidiaries and affiliates.

In order to collect, transfer, and disburse funds generated by LFG and its subsidiaries, LFG operated and administered a centralized cash management system (the "Cash Management System").[11] Under LFG's operation of the Cash Management System, subsidiaries would contribute their revenues to centralized cash accounts and LFG, as the disbursement agent, would pay out funds from the accounts.[12] Approximately ninety percent (90%) of LandAmerica revenue flowed through the Cash Management System. LFG maintained approximately thirty-one active bank accounts which were linked to the Cash Management System. For disbursements, LFG used funds from the Cash Management System accounts to pay LFG's

---

[10] OneStop was part of LFG's lender services business segment. It provided a full range of integrated residential real estate services. Southland was an underwritten title company which provided title, escrow and other real estate-related products and services to residential and commercial buyers and sellers, real estate agents and brokers, developers, attorneys, and mortgage brokers and lenders.

[11] *See* Motion for Order Authorizing: (A) Continued Use of the Debtor's Centralized Cash Management System; (B) Maintenance and Continued Use of the Debtor's Existing Bank Accounts and Business Forms; (C) a Waiver of Certain Operating Guidelines Relating to Bank Accounts; and (D) an Extension of Time for the Debtor to Comply with Section 345 of the Bankruptcy Code, filed in LFG's bankruptcy case, Case No. 08-35994, on November 29, 2008 [Doc. No. 5].

[12] There was no readily apparent cycle or periodic nature of cash transfers made to LFG on behalf of its subsidiaries. Rather, cash transfers were made regularly when cash was available at the subsidiary level. Cash LFG received on behalf of the subsidiaries was not applied in LFG's books to reimburse specific payments. Rather, LFG paid its subsidiaries' expenses as they became due and received its subsidiaries' cash when it became available.

4

obligations and to pay the obligations of its subsidiaries. There were no cash amounts that LFG received from, or on behalf of, OneStop or Southland other than through the operation of the Cash Management System.[13] LFG could not have paid its subsidiaries' expenses without receiving its subsidiaries' earned revenue through the Cash Management System.

From February 2008 through the Petition Date,[14] both OneStop and Southland required electricity to power their office buildings. During this period, Southern California Edison provided electric utility service to various LandAmerica entities including OneStop and Southland. As LFG had received all of the cash revenues generated by OneStop and Southland through the operation of the Cash Management System, neither OneStop nor Southland had sufficient funds to pay their own expenses during the Avoidance Period. Rather, pursuant to the Cash Management System, LFG, in its capacity as the disbursement agent for OneStop and Southland, paid the cash expenses of OneStop and Southland, including the expenses due to Southern California Edison. During the Avoidance Period, LFG paid roughly $237,292.36 to Southern California Edison for electricity provided to OneStop and Southland.

During the Avoidance Period, LFG received over $30 million more in revenues generated by OneStop than LFG disbursed on behalf of OneStop through the operation of the Cash Management System.[15] During this same time period, LFG received over $11 million more in

---

[13] While the parties have not discovered an executed, written agreement between LFG and OneStop or Southland authorizing LFG to collect substantially all of their cash revenues, it is evident that OneStop and Southland did in fact participate in the Cash Management System from February 2008 through the Petition Date, and that before that time period, there must have been oral and/or implied agreement between LFG and both OneStop and Southland relating to their participation in the Cash Management System.

[14] The nine-month period immediately preceding the Petition Date, which period is pertinent to this adversary proceeding, may be referred to hereinafter as the "Avoidance Period."

[15] From February 1, 2008 through the Petition Date, LFG received total cash transfers from OneStop in the amount of $289,488,203 and disbursed total cash transfers in the amount of $259,037,818 on behalf of OneStop.

5

revenues generated by Southland than LFG disbursed on behalf of Southland.[16] Thus, LFG received positive net cash flow from the operations of its OneStop and Southland subsidiaries during the Avoidance Period in the aggregate amount of roughly $40 million.

## Standard of Review

Summary judgment "is favored as a mechanism to secure the 'just, speedy, and inexpensive determination' of a case" when the requirements of Rule 56 of the Federal Rules of Civil Procedure are met. *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1322–23 (4th Cir. 1995) (quoting Fed. R. Civ. P. 1). Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). Summary judgment is appropriate when there are no "disputes over facts that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The relevant inquiry on summary judgment is:

> whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. An otherwise "properly supported motion for summary judgment" will not be defeated by the existence of merely any factual dispute, no matter how minor; rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." To withstand a summary judgment motion, the non-moving party must produce competent evidence sufficient to reveal the existence of a genuine issue of material fact for trial. Neither conclusory allegations, speculative scaffolding of one inference upon another, nor the production of a "mere scintilla of evidence" in support of a nonmovant's case suffices to forestall summary judgment.

*Moody v. Arc of Howard Cnty., Inc.*, 474 F. App'x 947, 949 (4th Cir. 2012) (citations omitted). "[O]nce the moving party has identified the absence of a genuine issue of material fact, the

---

[16] From February 1, 2008 through the Petition Date, LFG received total cash transfers from Southland in the amount of $47,269,366 and disbursed total cash transfers in the amount of $35,950,092 on behalf of Southland.

6

nonmoving party bears the burden of identifying specific facts that demonstrate the existence of a genuine issue for trial." *Hopkins v. Horizon Mgmt. Servs., Inc.*, 302 F. App'x 137, 139 (4th Cir. 2008).

## Discussion

Plaintiff maintains that LFG did not receive reasonably equivalent value in exchange for the Transfers it made to Southern California Edison. Plaintiff bases this argument on the assertion that LFG was not itself contractually obligated to Southern California Edison for the obligations of its subsidiaries that the Transfers paid, that LFG did not use the services provided by the Defendant, and that the only thing of value LFG received in exchange for the Transfers was an intercompany receivable from OneStop or Southland. 11 U.S.C. § 548 (a)(1)(B) allows a trustee to avoid a transaction where the Debtor made a transfer within two years prior to the date of filing the bankruptcy petition, if the Debtor received less than reasonably equivalent value in exchange for the transfer. "Value" is defined under 11 U.S.C. § 548(d)(2)(A) to mean "property, or satisfaction or securing of a present or antecedent debt of the debtor."

Generally, transfers made *solely* for the benefit of a third party do not constitute reasonably equivalent value. The Plaintiff argues that it did not receive any reasonably equivalent value from Southern California Edison. Section 548 of the Bankruptcy Code exists to preserve the Debtor's estate. *Ruby v. Ryan (In re Ryan)*, 472 B.R. 714, 724-25 (Bankr. E.D. Va. 2012); *see also Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Grp., Inc.)*, 956 F.2d 479, 485 (4th Cir. 1992) ("'The purpose of fraudulent transfer law is the preservation of the debtor's estate for the benefit of the unsecured creditors. Consequently, what constitutes reasonably equivalent value must be determined from the standpoint of the debtor's creditors. . . .'" (quoting Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer*

7

*Law*, 8 Bankr. Dev. J. 55, 80 (1991))); *Image Masters, Inc. v. Chase Home* Fin., 489 B.R. 375, 387 (E.D. Pa. 2013). There is no requirement in § 548 of the Bankruptcy Code that the reasonably equivalent value come directly from the party to whom the transfer was made.

The case law is well settled that so long as the Debtor's estate receives reasonably equivalent value, the value need not be given by the transferee. *In re Ryan*, 472 B.R. at 725 (citing *In re Jeffry Bigelow Design Group Inc.*, 956 F.2d at 484*; see also In re Kenrob Info. Technology Solutions Inc.*, 474 B.R. 799, 802 (Bankr. E.D. Va. 2012). "[I]f a transfer on behalf of a third party produces a concomitant economic benefit that ultimately flows to the debtor, even if the consideration for the transfer does not flow directly to the debtor, the debtor receives reasonably equivalent value and the transfer cannot be avoided." *Bakst v. U.S. (In re Kane & Kane)*, 479 B.R. 617, 629 (Bankr. S.D. Fla. 2012); *see also In re Jeffrey Bigelow Design Group, Inc.,* 956 F.2d at 484.

LFG actually received more in revenues from OneStop and Southland during the Avoidance Period than it paid in disbursements on their behalf. Plaintiff ignores the fact that the Transfers in question were made by LFG, as disbursement agent, with funds that OneStop and Southland had provided to LFG for the specific purpose of making payments to Southern California Edison and other utility service providers. At the time the Transfers were made, OneStop and Southland could have paid their own operating expenses had the Cash Management System not been employed. Instead of paying their expenses out of bank accounts containing their own cash revenues, OneStop and Southland upstreamed their revenues to LFG and delegated the disbursement function to LFG. Through the operation of the Cash Management System, OneStop and Southland were continuously contributing all of their earned revenue to LFG for the very purpose of LFG paying all of OneStop's and Southland's operating expenses.

8

Despite the fact that LFG comingled the funds it received from its various subsidiaries,[17] there is no question that LFG received over $40 million more in funds from OneStop and Southland than it disbursed on their behalf. LFG's estate was not depleted by the operation of the Cash Management System insofar as it applied to OneStop or to Southland. LFG's creditors were not harmed by the Transfers or any of the disbursements made on behalf of OneStop or Southland.

A transfer of an interest in property to secure or pay antecedent indebtedness will normally be deemed to constitute reasonably equivalent value. *Official Comm. of Unsecured Creditors of Heilig-Meyers Co. v. Wachovia Bank, N.A. (In re Heilig-Meyers Co.)*, 297 B.R. 46 (Bankr. E.D. Va. 2003); *see also In re Kaplan Breslaw Ash, LLC*, 264 B.R. 309, 328 (Bankr. S.D.N.Y. 2001) (holding that Debtors "receive value when [their] delivery of property secures a present or antecedent debt of the debtor"). Plaintiff maintains that the lack of any written contractual obligation between LFG and Southern California Edison demonstrates the absence of any antecedent debt owing between the parties that was satisfied in exchange for the Transfers. While Southern California Edison agrees that there was no direct contract between LFG and Southern California Edison, it argues that LFG was obligated, nevertheless, to make the Transfers that it did to Southern California Edison. Plaintiff concedes that there must have been an oral or implied agreement between LFG on the one hand and OneStop and Southland on the other hand, relating to those affiliates' participation in the Cash Management System. The consideration LFG received in exchange for its payment of the operating expenses of OneStop and Southland was the receipt of all their cash revenues. LFG's role in the Cash Management System was that of the disbursement agent. LFG not only had a contractual duty, but also a

---

[17] The Cash Management System was designed not only to collect, transfer and disburse funds generated by LFG affiliates but also to allocate and record each deposit, transfer and disbursement by cost center code that corresponded to the specific legal entity.

9

fiduciary obligation to make disbursements on behalf of its subsidiaries.[18] The absence of express contracts between LFG on the one hand and OneStop or Southland on the other requiring LFG to make the Transfers is of no moment. The contractual obligation between the companies was implied.[19] Implied contracts rely on the intent of the parties; in this case, the intent is clear and unambiguous. *See In re Fas Mart Convenience Stores, Inc.*, 320 B.R. 587, 595 (Bankr. E.D. Va. 2004). OneStop and Southland upstreamed all of their revenues to LFG with the very clear expectation that LFG would pay their operating expenses through the Cash Management System, which was specifically designed for that purpose.

When LFG made the Transfers to Southern California Edison, it was satisfying an obligation it owed to OneStop or Southland. LFG therefore received reasonably equivalent value in exchange. *See Crumpton v. Stephens (In re Northlake Foods, Inc.)*, 715 F.3d 1251, 1256 (11th Cir. 2013); *see also Schoenmann v. BCCI Constr. Co. (In re NorthPoint Communications Group, Inc.)*, 361 B.R. 149, 161 (Bankr. N.D. Cal. 2007) ("Satisfaction of a valid obligation constitutes reasonably equivalent value.").

Count II of the Complaint alleges that the Transfers should be avoided under 11 U.S.C. § 544(b)(1) and Virginia Code § 55-81, because the transfers were not made in exchange for valuable consideration. The Virginia voluntary conveyance statute[20] provides, in pertinent part:

---

[18] "Agency is a fiduciary relationship between two parties in which one party agrees to act on behalf of and subject to the control of the other party." *Banks v. Mario Indus. of Va., Inc.*, 650 S.E.2d 687, 695 (Va. 2007). "Agency may be inferred by the conduct of the parties." *Accordia of Va. Ins. Agency, Inc. v. Genito Glenn, L.P.,* 560 S.E.2d 246, 250 (Va. 2002) (quoting *Drake v. Livesay*, 341 S.E.2d 186, 189 (1986)).

[19] "A contract implied in fact is 'a true contract containing all necessary elements for a binding agreement except that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the circumstances.' This type of contract must be based upon clear evidence of the parties' intent to contract and not upon the parties' course of dealing." *In re Fas Mart Convenience Stores, Inc.*, 320 B.R. 587, 595 (Bankr. E.D. Va. 2004) (citation omitted).

[20] Virginia has not adopted either the Uniform Fraudulent Conveyance Act (UFCA) or the Uniform Fraudulent Transfer Act (UFTA). Virginia fraudulent conveyance law remains modeled after the old Statute of 13 Elizabeth.

10

> Every gift, conveyance, assignment, transfer or charge which is not upon consideration deemed valuable in law, or which is upon consideration of marriage, by an insolvent transferor, or by a transferor who is thereby rendered insolvent, shall be void as to creditors whose debts shall have been contracted at the time it was made. . . .

Va. Code § 55-81. The requirement of consideration deemed valuable at law set forth in Virginia Code § 55-81 is a substantially lower standard than that required under 11 U.S.C. § 548(a)(1)(B). This Court has held that "[a]s long as something [is] gained, that is enough [compensation] to prevent avoidance of the transaction under Virginia Code § 55-81." *See In re James River Coal Co.,* 360 B.R. 139, 167 (Bankr. E.D. Va. 2007) (quoting *C-T of Virginia v. Euroshoe Associates*, 762 F. Supp. 675 (W.D. Va. 1991), *aff'd,* 953 F.2d 637 (4th Cir. 1992)). As the Court has found that the Transfers were made in exchange for reasonably equivalent value, LFG necessarily received consideration deemed valuable at law in exchange therefor.

## Conclusion

For the above reasons, the Court finds that there are no material facts in dispute and that the Trustee cannot meet his burden under 11 U.S.C. § 548(a)(1)(b) or under Virginia Code § 55-81. Through the operation of the Centralized Cash Management System, LFG satisfied an antecedent obligation it owed to OneStop and Southland when it paid their ordinary course operating expenses to Southern California Edison in its capacity as distribution agent. The Court finds as a matter of law that LFG received reasonably equivalent value in exchange for the Transfers it made to Southern California Edison. Accordingly, the Court will deny the motion for summary judgment filed by LFG and grant the motion for summary judgment filed by Southern California Edison.

---

Va. Code § 55-81 was enacted to defeat frauds perpetrated upon existing creditors by the marriage of an insolvent debtor, accompanied by gifts to his wife. *See Hyman v. Porter,* 37 B.R. 56 (Bankr. E.D. Va. 1984).

A separate order shall issue.

ENTERED: May 19, 2014
_____

/s/ Kevin R. Huennekens
UNITED STATES BANKRUPTCY JUDGE

Entered on Docket: 5/19/14